UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :      INDICTMENT

        -v.-                                14 CRIM 747

MARTIN DUNKI,

            Defendant.                :

- - - - - - - - - - - - - - - - - - - - x

USDC SD
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: NOV 1 3 2014

### COUNT ONE
### (Conspiracy)

        The Grand Jury charges:

### The Defendant and Associated Entities and Persons

        1.   At all times relevant to this Indictment, MARTIN

DUNKI, the defendant, was a citizen and resident of Switzerland,

and worked as a client advisor at a Swiss bank headquartered in

Zurich, Switzerland ("Swiss Bank No. 1").  Prior to retiring in

or about early 2012, DUNKI was a Senior Vice President at Swiss

Bank No. 1.

        2.   At all times relevant to this Indictment,

MARTIN DUNKI, the defendant, in his capacity as a client advisor

at Swiss Bank No. 1, provided advice and assistance to U.S.

taxpayers in maintaining undeclared accounts at Swiss Bank No.

1.

        3.   At all times relevant to this Indictment, Swiss

Bank No. 1, which purports to be the oldest private bank in

JUDGE FORREST

Zurich, provided private banking services to and maintained undeclared accounts for U.S. taxpayers.

4.     At all times relevant to this Indictment, Edgar Paltzer ("Paltzer"), a co-conspirator not named as a defendant herein, was an attorney based in Zurich, Switzerland who practiced in the areas of "international private client work, wealth transfer planning, successions, trusts and Foundation[s], on-shore and off-shore structures, private banking[,] and individual taxation."  Paltzer served as a financial intermediary for U.S. taxpayers who maintained undeclared accounts in Switzerland, including U.S. taxpayers who maintained undeclared accounts at Swiss Bank No. 1.

5.     In or about February 2009, UBS AG ("UBS"), a Swiss bank that provided private banking services to and maintained undeclared accounts for U.S. taxpayers, entered into a deferred prosecution agreement with the United States Department of Justice in connection with its participation in a scheme to defraud the United States and the Internal Revenue Service ("IRS").

### Obligations of United States Taxpayers
### With Respect to Foreign Financial Accounts

6.     Citizens and residents of the United States who have income in any one calendar year in excess of a threshold amount ("U.S. taxpayers") are obligated to file a U.S.

Individual Income Tax Return, Form 1040 ("Form 1040"), for that

calendar year with the IRS.  At all times relevant to this

Indictment, Form 1040 required U.S. taxpayers to report their

income from any source, regardless of whether the source of

their income is inside or outside the United States.  In

addition, on Schedule B of Form 1040, the filer must indicate

whether "at any time during [the relevant calendar year]" the

filer had "an interest in or a signature or other authority over

a financial account in a foreign country, such as a bank

account, securities account, or other financial account."  If

the U.S. taxpayer answers that question in the affirmative, then

the U.S. taxpayer must indicate the name of the particular

country in which the account is located.

       7.     Separate and apart from the obligation to file

Forms 1040 that report all income, U.S. taxpayers who have a

financial interest in, or signature authority over, a financial

account in a foreign country with an aggregate value of more

than $10,000 at any time during a particular calendar year are

required to file with the IRS a Report of Foreign Bank and

Financial Accounts, Form TD F 90-22.1 ("FBAR").  The FBAR for

any calendar year is required to be filed on or before June 30

of the following calendar year.  In general, the FBAR requires

that the U.S. taxpayer filing the form identify the financial

institution with which the financial account is held, the type

of account (bank, securities, or other), the account number, and the maximum value of the account during the calendar year for which the FBAR is being filed.

8.    When a U.S. taxpayer beneficially owns a bank, securities, or other financial account that is maintained outside the United States, but fails to disclose the account or the income generated in the account to the IRS on Schedule B of Form 1040 or on an FBAR, the account is referred to as an "undeclared account."

### The Conspiracy

9.    From at least in or about 1995 through in or about at least 2012, MARTIN DUNKI, the defendant, conspired with various U.S. taxpayers, including U.S. taxpayers in the Southern District of New York, and others known and unknown, to enable his U.S. taxpayer clients to establish and maintain secret Swiss bank accounts, and to hide those accounts and the income generated in those accounts, from the taxation authority of the United States, the IRS, via false and fraudulent federal income tax returns.

### Means and Methods of the Conspiracy

10.    Among the means and methods by which MARTIN DUNKI, the defendant, and his co-conspirators would and did carry out the conspiracy were the following:

a.    DUNKI and his co-conspirators opened, maintained, and/or managed undeclared accounts on behalf of U.S. taxpayers at Swiss Bank No. 1.

b.    DUNKI and his co-conspirators used sham "foundations" and other entities formed under the laws of countries such as Liechtenstein and Panama to conceal, from the IRS and others, the ownership by U.S. taxpayers of accounts established at Swiss Bank No. 1, as well as the income generated in those accounts.

c.    U.S. taxpayers who conspired with DUNKI filed false and fraudulent Forms 1040, which, among other things, failed to report their interest in their undeclared accounts and the income generated in their undeclared accounts.

d.    U.S. taxpayers who conspired with DUNKI failed to file FBARs identifying their undeclared accounts.

e.    Beginning in or about August 2009, following the deferred prosecution agreement between UBS and the United States Department of Justice, DUNKI and his co-conspirators further concealed the undeclared accounts of certain U.S. taxpayer-clients at Swiss Bank No. 1 by using the assets in their accounts to purchase gold and other precious metals. DUNKI and his co-conspirators then transferred the gold, other precious metals, and cash to escrow accounts at Swiss Bank No. 1, and deposited the gold, precious metals, and cash into a

vault rented at UBS, where they were kept for the benefit of the U.S. taxpayer-clients.

        f.    DUNKI traveled to the United States, and caused his U.S. taxpayer-clients to travel to Switzerland, in order to conduct business relating to the undeclared accounts, including reviewing account statements, which were deliberately not sent to the U.S. taxpayers in the United States.

        g.    DUNKI and his co-conspirators helped U.S. taxpayers repatriate funds to the United States from their undeclared accounts in Switzerland in a manner designed to ensure that U.S. authorities did not discover these undeclared accounts.

<b><u>DUNKI's U.S. Taxpayer Clients</u></b>

        11.    At various times relevant to this Indictment, MARTIN DUNKI, the defendant, opened, maintained, and managed undeclared accounts at Swiss Bank No. 1 for U.S. taxpayers holding hundreds of millions of dollars in undeclared assets. Details for several U.S. taxpayers for whom DUNKI opened, maintained, and managed undeclared accounts are set forth more fully below.

<b><u>The DUNKI/Attorney 1 Clients</u></b>

        12.    In or about 1999, Paltzer was introduced to a U.S. lawyer ("Attorney 1"), a co-conspirator not named as a defendant herein, who resided in Santa Barbara, California and

6

who wished to set up undeclared accounts for U.S. taxpayers at Swiss Bank No. 1. Attorney 1's point of contact at Swiss Bank No. 1 was MARTIN DUNKI, the defendant, who was employed at Swiss Bank No. 1 as a client advisor. Attorney 1 requested that Paltzer establish sham foundations, organized under the laws of non-U.S. countries such as Liechtenstein, so that the assets of the U.S. taxpayers could be maintained at Swiss Bank No. 1 in accounts held in the names of these foreign foundations, rather than in the names of the clients themselves. Attorney 1 made this request in order to help conceal from the IRS the existence of Attorney 1's U.S. taxpayer-clients' undeclared accounts in Switzerland.

13. In or about 1999 and 2000, Attorney 1 opened multiple undeclared accounts at Swiss Bank No. 1 for the benefit of different U.S. taxpayers. These accounts were held in the names of sham Liechtenstein foundations, all of which had been created by Paltzer at Attorney 1's request. Paltzer sat on the boards of these sham foundations and, in that capacity, received instructions from Attorney 1 regarding the management and distribution of the assets from the accounts at Swiss Bank No. 1. Paltzer passed these instructions on to MARTIN DUNKI, the defendant, who was the client advisor for these accounts at Swiss Bank No. 1 and had the authority to implement the instructions on behalf of Swiss Bank No. 1.

14.   In or about 2008, Attorney 1 passed away, and left the responsibility for managing the undeclared accounts that Attorney 1 had opened at Swiss Bank No. 1 to three other U.S.-based attorneys ("Attorney 2," "Attorney 3," and "Attorney 4") (collectively, "Attorney 1's Successors"), who are co-conspirators not named as defendants herein.   After Attorney 1 passed away, MARTIN DUNKI, the defendant, continued to be the client advisor for these undeclared accounts at Swiss Bank No. 1, and continued to implement the instructions passed on through Paltzer.

15.   In or about May and June 2008, it became publicly known that UBS was being investigated by United States law enforcement for helping U.S. taxpayers maintain undeclared accounts.   Thereafter, on or about December 8, 2008, Liechtenstein and the United States signed a Tax Information Exchange Treaty ("TIEA"), under which Liechtenstein agreed to provide the United States with access to bank and other information needed to enforce U.S. tax laws.   As a result of the TIEA between Liechtenstein and the United States, and to prevent disclosure to the U.S. government of their U.S. taxpayer-clients' undeclared accounts at Swiss Bank No. 1, Paltzer and Attorney 1's Successors determined to transfer their clients' undeclared assets from the accounts at Swiss Bank No. 1 held by sham foundations organized under the laws of Liechtenstein to

8

new accounts at Swiss Bank No. 1 held by sham foundations

organized under the laws of Panama.  In or about mid-December

2008, MARTIN DUNKI, the defendant, transferred the clients'

undeclared assets to these sham Panamanian foundations.  Paltzer

created the sham Panamanian foundations and served on the boards

of these foundations, which, like the sham Liechtenstein

foundations, existed solely for the purpose of concealing the

U.S. taxpayer-clients' interest in the accounts.

16.  As part of the account opening process for the

new sham Panamanian foundations, MARTIN DUNKI, the defendant,

helped compile and execute certain account opening documentation

at Swiss Bank No. 1.  This account opening documentation

included a "Form A," which identified the name of the true

beneficial owner of the account, that client's address in the

United States, and that client's status as a U.S. citizen or

permanent resident alien.

17.  In or about August 2009, as a result of the

investigation of UBS, MARTIN DUNKI, the defendant, Paltzer, and

Attorney 1's Successors determined to further conceal the

undeclared assets of their U.S. taxpayer-clients at Swiss Bank

No. 1 by using these assets, which had previously been hidden in

the manner described above, to purchase gold and other precious

metals, which would ultimately be hidden in a vault rented at

UBS.  To accomplish this, Paltzer opened multiple escrow

accounts in his own name at Swiss Bank No. 1 (the "Escrow Accounts"). Each of the Escrow Accounts corresponded to the undeclared account of a U.S. taxpayer-client that was held in the name of a sham Panamanian foundation, and each of the Escrow Accounts was given, as a reference code, the initials of the sham Panamanian foundation account to which it corresponded. DUNKI and Attorney 1's Successors then used their U.S. taxpayer-clients' undeclared assets to purchase gold and other precious metals, which they caused to be transferred to the Escrow Accounts, and then deposited into a vault at UBS (the "Vault"). The gold and precious metals, which amounted to tens of millions of dollars, were then maintained in the Vault, along with substantial sums of cash, for the benefit of the U.S. taxpayer-clients. Attorney 1's Successors instructed that the assets should remain in the Vault for approximately six years, when Attorney 1's Successors believed that the statute of limitations would expire for any applicable U.S. tax prosecutions.

18. The clients with undeclared accounts at Swiss Bank No. 1, whose assets were ultimately concealed in the Vault with the assistance of MARTIN DUNKI, the defendant, included the following U.S. taxpayer-clients, whose accounts are discussed in further detail below.

10

## Clients 1 and 2

19.   In or about November 1999, Paltzer, at the request of Attorney 1, established a sham Liechtenstein foundation called the Grace Filled Heart Foundation, for the benefit of two of Attorney 1's U.S. taxpayer-clients ("Client 1" and "Client 2"). At all times relevant to this Indictment, Client 1 and Client 2 were married to one another, were citizens of the United States, and resided in Mill Valley, California.

20.   Following Paltzer's establishment of the Grace Filled Hart Foundation, Attorney 1 opened an undeclared bank account at Swiss Bank No. 1, which was for the benefit of Client 1 and Client 2, but which was held in the name of the Grace Filled Heart Foundation in order to keep the account hidden from U.S. authorities. Paltzer sat on the board of the Grace Filled Heart Foundation and, in that capacity, received instructions from Attorney 1 and, later, Attorney 1's Successors, regarding the management and distribution of the assets from Client 1 and Client 2's undeclared account. Paltzer passed these instructions on to MARTIN DUNKI, the defendant, who was the client advisor for Client 1 and Client 2's undeclared account and had the authority to implement the instructions.

21.   In or about mid-December 2008, to prevent Client 1 and Client 2's undeclared account from being disclosed pursuant to the newly signed TIEA between Liechtenstein and the

United States, MARTIN DUNKI, the defendant, and Paltzer
transferred Client 1 and Client 2's undeclared assets from the
account held by the sham Liechtenstein foundation to a new
account held by a sham Panamanian foundation, which was also
called the Grace Filled Heart Foundation.  For instance, in a
December 17, 2008 letter from Paltzer to DUNKI, Paltzer wrote,
in pertinent part, as follows:

> "Dear Martin,
>
> Please be kind enough to transfer all present monies
> and assets held by your bank for the account of our
> foundation (as well as all future monies and assets,
> if any, which will be credited to such account at your
> bank) to the accounts of a new foundation with the
> same name (Grace Filled Heart Foundation) established
> pursuant to the laws of Panama and, thereafter, to
> close our account with your bank."

22.  As part of the account opening process for the
sham Panamanian Grace Filled Heart Foundation, MARTIN DUNKI, the
defendant, helped compile and execute certain account opening
documentation at Swiss Bank No. 1.  This account opening
documentation included a "Form A," dated December 17, 2008,
which identified Client 1 and Client 2 as the true beneficial
owners of the undeclared account, identified the address of
Client 1 and Client 2 in Mill Valley, California, and identified
the status of Client 1 and Client 2 as U.S. citizens.

23.  In or about August 2009, as a result of the
investigation of UBS, MARTIN DUNKI, the defendant, Paltzer, and

Attorney 1's Successors determined to further conceal the undeclared assets of Client 1 and Client 2 at Swiss Bank No. 1 by using these assets, which had previously been hidden in the Grace Filled Heart Foundation accounts, to purchase gold, which would ultimately be hidden in the Vault.  In or about December 2009, to effectuate this plan, Paltzer opened in his own name an escrow account at Swiss Bank No. 1 with the reference "GF," which corresponded to the Grace Filled Heart Foundation. Thereafter, DUNKI and Attorney 1's Successors arranged for gold and cash to be transferred to Paltzer's "GF" escrow account, and then deposited in the Vault for the benefit of Client 1 and Client 2.

        24.  For instance, on or about May 7, 2010, Attorney 2 wrote a letter to Paltzer in which Attorney 2 instructed Paltzer as follows:

> "Dear Edgar,
>
> Please pick up the following items from Martin Dunki at your convenience:
>
> 1. 345 Krugerrands
> 2. 10 Kilograms gold
> 3. 293 Sovereigns
> 4. 330 Belgian Leopolds
>
> This delivery is called Group 4 and is to be held by the Grace Filled Heart Foundation."

Paltzer did as instructed by Attorney 2, and coordinated with MARTIN DUNKI, the defendant, to receive delivery of these items

13

in the "GF" escrow account at Swiss Bank No. 1.  Thereafter, the
items were deposited into the Vault for the benefit of Client 1
and Client 2.

      25.  Similarly, on or about August 3, 2010, Attorney 2
wrote a letter to Paltzer in which Attorney 2 instructed Paltzer
as follows:

> "Dear Edgar,
>
> At your convenience, please arrange to pick up
> the following items from Martin, called "Group
> 4B":
>
> - 15 kilos gold
> - 1,702 Krugerrands
> - 2,176 Sovereigns
> - 270 Austrian 100 Kronors
> - 11 American Eagles
> - USD 100,000 in envelope marked
>   "Group 4-G949"
> - CHF 53,000.00 in envelope marked
>   "Group 4-G62"
> - CHF 100,000.00 in envelope marked
>   "Group 4-G952"
> - CHF 100,000.00 in envelope marked
>   "Group 4-G952T"

Paltzer did as instructed by Attorney 2, and coordinated with
MARTIN DUNKI, the defendant, to receive delivery of these items
in the "GF" escrow account at Swiss Bank No. 1.  Thereafter, the
items were deposited into the Vault for the benefit of Client 1
and Client 2.

      26.  Between in or about December 2009 and in or about
late 2012, millions of dollars in gold and cash were transferred

by MARTIN DUNKI, the defendant, Attorney 2, and Paltzer to the Vault for the benefit of Client 1 and Client 2.

27.   On Client 1's Forms 1040 for the tax years 2000 through and including 2012, Client 1 falsely and fraudulently failed to report Client 1's interest in, or signature or other authority over, Client 1's undeclared accounts at Swiss Bank No. 1.   Moreover, for these years, Client 1 failed to file an FBAR disclosing Client 1's undeclared accounts at Swiss Bank No. 1.

28.   Likewise, on Client 2's Forms 1040 for the tax years 2000 through and including 2012, Client 2 falsely and fraudulently failed to report Client 2's interest in, or signature or other authority over, Client 2's undeclared accounts at Swiss Bank No. 1.   Moreover, for these years, Client 2 failed to file an FBAR disclosing Client 2's undeclared accounts at Swiss Bank No. 1.

29.   In or about June 2013, Client 1 and Client 2 applied for admission to the voluntary disclosure program, and disclosed their undeclared accounts to the IRS for the first time.

### Client 3

30.   In or about November 1999, Paltzer, at the request of Attorney 1, established a sham Liechtenstein Foundation called the Kingsgate Norman Foundation, for the benefit of one of Attorney 1's U.S. taxpayer-clients ("Client

3"). At all times relevant to this Indictment, Client 3 was a citizen of the United States and resided in Santa Cruz, California.

31. Following Paltzer's establishment of the Kingsgate Norman Foundation, Attorney 1 opened an undeclared bank account at Swiss Bank No. 1, which was for the benefit of Client 3, but which was held in the name of the Kingsgate Norman Foundation in order to keep the account hidden from U.S. authorities. Paltzer sat on the board of the Kingsgate Norman Foundation and, in that capacity, received instructions from Attorney 1 and, later, Attorney 1's Successors, regarding the management and distribution of the assets from Client 3's undeclared account. Paltzer passed these instructions on to MARTIN DUNKI, the defendant, who was the client advisor for Client 3's undeclared account and had the authority to implement the instructions.

32. In or about mid-December 2008, to prevent Client 3's undeclared account from being disclosed pursuant to the newly signed TIEA between Liechtenstein and the United States, MARTIN DUNKI, the defendant, and Paltzer transferred Client 3's undeclared assets from the account held by the sham Liechtenstein foundation to a new account held by a sham Panamanian foundation, which was also called the Kingsgate Norman Foundation.

33.   As part of the account opening process for the sham Panamanian Kingsgate Norman Foundation, MARTIN DUNKI, the defendant, helped compile and execute certain account opening documentation at Swiss Bank No. 1.  This account opening documentation included a "Form A," dated December 17, 2008, which identified Client 3 as the true beneficial owner of the undeclared account, identified the address of Client 3 in Santa Cruz, California, and identified the status of Client 3 as a U.S. citizen.

34.   In or about August 2009, as a result of the IRS's investigation of UBS, MARTIN DUNKI, the defendant, Paltzer, and Attorney 1's Successors determined to further conceal the undeclared assets of Client 3 at Swiss Bank No. 1 by using these assets, which had previously been hidden in the Kingsgate Norman Foundation accounts, to purchase gold and other precious metals, which would ultimately be hidden in the Vault.  In or about December 2009, to effectuate this plan, Paltzer opened in his own name an escrow account at Swiss Bank No. 1 with the reference "KN," which corresponded to the Kingsgate Norman Foundation.  Thereafter, DUNKI and Attorney 1's Successors arranged for gold and other precious metals to be transferred to Paltzer's "KN" escrow account, and then deposited in the Vault for the benefit of Client 3.

17

35.  For instance, on or about March 19, 2010,
Attorney 2 wrote a letter to Paltzer in which Attorney 2
instructed Paltzer as follows:

> "Dear Edgar,
>
> At your convenience, please coordinate with
> Martin on the receipt of the following items, to
> be called "Group 2."  Please place these items
> into the Kingsgate Fon.
>
>     - 76 kg gold
>     - 8,907 Krugerrands
>     - 170 ounces platinum
>     - 320 USA Eagle $50 coins"

Paltzer did as instructed by Attorney 2, and coordinated with
MARTIN DUNKI, the defendant, to receive delivery of these items
in the "KN" escrow account at Swiss Bank No. 1.  Thereafter, the
items were deposited into the Vault for the benefit of Client 3.

36.  Similarly, on or about May 6, 2010, Attorney 2
wrote a letter to Paltzer in which Attorney 2 instructed Paltzer
as follows:

> "Dear Edgar,
>
> You will be receiving some coins from Martin
> Dunki.  The coins will be called "Group 2."  They
> will consist of:
>
>     - 137 Krugerrands
>     - 81 Oesterreich KR 100's
>     - 170 ounces platinum
>
> Please add these coins to the Kingsgate Norman
> Foundation."

18

Paltzer did as instructed by Attorney 2, and coordinated with MARTIN DUNKI, the defendant, to receive delivery of the coins in the "KN" escrow account at Swiss Bank No. 1. Thereafter, the coins were deposited into the Vault for the benefit of Client 3.

37. Between in or about March 2010 and in or about late 2012, tens of millions of dollars in gold and other precious metals were transferred by MARTIN DUNKI, the defendant, Attorney 2, and Paltzer to the Vault for the benefit of Client 3.

38. On Client 3's Forms 1040 for the tax years 2000 through and including 2012, Client 3 falsely and fraudulently failed to report Client 3's interest in, or signature or other authority over, Client 3's undeclared accounts at Swiss Bank No. 1. Moreover, for these years, Client 3 failed to file an FBAR disclosing Client 3's undeclared accounts at Swiss Bank No. 1.

39. In or about June 2013, Client 3 applied for admission to the voluntary disclosure program, and disclosed Client 3's undeclared accounts to the IRS for the first time.

### Client 4

40. In or about November 1999, Paltzer, at the request of Attorney 1, established a sham Liechtenstein foundation called the Bishopsgate Foundation, for the benefit of one of Attorney 1's U.S. taxpayer-clients ("Client 4"). At all times relevant to this Indictment, Client 4 was a citizen of the

United States, and resided in Danville, California.

41.    Following Paltzer's establishment of the
Bishopsgate Foundation, Attorney 1 opened an undeclared bank
account at Swiss Bank No. 1, which was for the benefit of Client
4, but which was held in the name of the Bishopsgate Foundation
in order to keep the account hidden from U.S. authorities.
Paltzer sat on the board of the Bishopsgate Foundation and, in
that capacity, received instructions from Attorney 1 and, later,
Attorney 1's Successors, regarding the management and
distribution of the assets from Client 4's undeclared account.
Paltzer passed these instructions on to MARTIN DUNKI, the
defendant, who was the client advisor for Client 4's undeclared
account and had the authority to implement the instructions.

42.    In or about mid-December 2008, to prevent Client-
4's undeclared account from being disclosed pursuant to the
newly signed TIEA between Liechtenstein and the United States,
MARTIN DUNKI, the defendant, and Paltzer transferred Client 4's
undeclared assets from the account held by the sham
Liechtenstein foundation to a new account held by a sham
Panamanian foundation, which was also called the Bishopsgate
Foundation.

43.    As part of the account opening process for the
sham Panamanian Bishopsgate Foundation, MARTIN DUNKI, the
defendant, helped compile and execute certain account opening

documentation at Swiss Bank No. 1.  This account opening
documentation included a "Form A," dated December 17, 2008,
which identified Client 4 as the true beneficial owner of the
undeclared account, the address of Client 4 in Danville,
California, and the status of Client 4 as a U.S. citizen.

44.  In or about August 2009, as a result of the IRS's
investigation of UBS, MARTIN DUNKI, the defendant, Paltzer, and
Attorney 1's Successors determined to further conceal the
undeclared assets of Client 4 at Swiss Bank No. 1 by using these
assets, which had previously been hidden in the Bishopsgate
Foundation accounts, to purchase gold, which would ultimately be
hidden in the Vault.  In or about December 2009, to effectuate
this plan, Paltzer opened in his own name an escrow account at
Swiss Bank No. 1 with the reference "BI," which corresponded to
the Bishopsgate Foundation.  Thereafter, DUNKI and Attorney 1's
Successors arranged for gold and cash to be transferred to
Paltzer's "BI" escrow account, and then deposited in the Vault
for the benefit of Client 4.

45.  For instance, on or about August 3, 2010,
Attorney 2, who is one of Attorney 1's Successors, wrote a
letter to Paltzer in which Attorney 2 instructed Paltzer as
follows:

"Dear Edgar,

21

At your convenience, please arrange to pick up the following items in "Group 3":

- 115 Krugerrands
- CHF 700,000.00 in envelope marked "Group 3"

Paltzer did as instructed by Attorney 2, and coordinated with MARTIN DUNKI, the defendant, to receive delivery of these items in the "BI" escrow account at Swiss Bank No. 1. Thereafter, the items were deposited into the Vault for the benefit of Client 4.

46. Between in or about August 2009 and in or about the middle of 2011, millions of dollars in gold and cash were transferred by MARTIN DUNKI, the defendant, Attorney 2, and Paltzer to the Vault for the benefit of Client 4.

47. On Client 4's Forms 1040 for the tax years 2000 through and including 2012, Client 4 falsely and fraudulently failed to report Client 4's interest in, or signature or other authority over, Client 4's undeclared accounts at Swiss Bank No. 1. Moreover, for these years, Client 4 failed to file an FBAR disclosing Client 4's undeclared accounts at Swiss Bank No. 1.

48. In or about June 2013, Client 4 applied for admission to the voluntary disclosure program, and disclosed Client 4's undeclared accounts to the IRS for the first time.

## Other Dunki Clients

49.   In addition to opening, maintaining, and managing undeclared accounts at Swiss Bank No. 1 for the clients of Attorney 1 and Attorney 1's Successors, MARTIN DUNKI, the defendant, opened, maintained, and managed undeclared accounts at Swiss Bank No. 1 for other U.S. taxpayer-clients, including the U.S. taxpayer-clients set forth below.

## Client 5

50.   In or about 2000, Paltzer, at the request of MARTIN DUNKI, the defendant, created a sham Liechtenstein foundation called the Merek Foundation.  The Merek Foundation had an underlying sham company called Kerem Properties Ltd., which held an undeclared bank account at Swiss Bank No. 1 for the benefit of a U.S. taxpayer ("Client 5").  At all times relevant to this Indictment, Client 5 was a citizen of the United States and resided in New York, New York.

51.   Paltzer sat on the board of the Merek Foundation and, in that capacity, received instructions regarding the management and distribution of the assets from Client 5's undeclared account at Swiss Bank No. 1.  Client 5 would first give the instructions to MARTIN DUNKI, the defendant, who was the client advisor for Client 5's undeclared account at Swiss Bank No. 1.  DUNKI would then pass Client 5's instructions on to Paltzer, who, together with DUNKI, would implement the

23

instructions.

52.   Between in or about 2000 and in or about the end of 2008, Client 5 regularly made withdrawals from Client 5's undeclared account at Swiss Bank No. 1.  MARTIN DUNKI, the defendant, helped Client 5 make these withdrawals in a manner deliberately designed to repatriate the funds to the United States without revealing the account's existence.  For instance, approximately twice a month, Client 5 asked DUNKI and Paltzer to transfer approximately $100,000 from Client 5's undeclared account to another account in Geneva, Switzerland and, from there, to a diamond dealer (the "Diamond Dealer") on 47th Street in New York, New York.  Once the money was received by the Diamond Dealer, Client 5 would pick it up and would give the Diamond Dealer a fraction of the money as a commission.

53.   By in or about late 2008, the value of Client 5's undeclared account at Swiss Bank No. 1 had been reduced, through the covert withdrawals described above, from millions of dollars to approximately $100,000.  Paltzer withdrew the remaining $100,000 from the undeclared account in cash, and transferred a portion of the cash to an art company, at the direction of Client 5 and MARTIN DUNKI, the defendant.  In or about December 2008, Client 5's undeclared account was closed.

54.   On Client 5's Forms 1040 for the tax years 2000 through and including 2008, Client 5 falsely and fraudulently

failed to report Client 5's interest in, or signature or other authority over, Client 5's undeclared account at Swiss Bank No. 1. Moreover, for these years, Client 5 failed to file an FBAR disclosing Client 5's undeclared account at Swiss Bank No. 1.

55. Client 5 has never entered the voluntary disclosure program.

## Client 6

56. In or about 2000, a U.S. taxpayer ("Client 6") opened an undeclared account at Swiss Bank No. 1 in the name of a sham Liberian corporation called Aroma. Client 6 created Aroma for the purpose of holding Client 6's undeclared account and concealing its existence from U.S. tax authorities. Client 6 is a dual citizen of Canada and the United States who, at all times relevant to this Indictment, resided in New York, New York and Fisher Island, Florida.

57. Client 6 was assisted in opening Client 6's undeclared account at Swiss Bank No. 1 by MARTIN DUNKI, the defendant, who thereafter served as the client advisor for Client 6's undeclared account. As part of the account opening process for the sham Liberian Aroma corporation, account opening paperwork was completed at Swiss Bank No. 1 indicating that the currency in the account was to be held in U.S. dollars. Further, a "Form A" was completed, which identified Client 6 as the true beneficial owner of the undeclared account.

58.   The "Form A" for the sham Liberian Aroma corporation further indicated, falsely, that Client 6 was a resident of Canada.   However, MARTIN DUNKI, the defendant, knew that Client 6 resided in the United States, and that Client 6 was using a Canadian address as another method of concealing from U.S. authorities the existence of Client 6's undeclared account.

59.   For instance, on or about January 11, 2001, Client 6 sent MARTIN DUNKI, the defendant, a letter stating, in substance and in part, that DUNKI should "address[]" mail to Client 6 at a Canadian address, but should send the mail to Client 6 at an address in New York, New York.   In this letter, Client 6 further instructed DUNKI to use DUNKI's own home address "as a return address on the envelope," and told DUNKI to contact Client 6 by phone at a phone number in New York, New York.

60.   Moreover, on or about February 12, 2001, MARTIN DUNKI, the defendant, sent Client 6 an email to a "nyc.rr.com" email address.   In response, Client 6 wrote another letter to DUNKI, dated February 12, 2001, in which Client 6 asked DUNKI to use email "as sparingly as possible" because "email is such an 'open' method of communication."   In the same letter, Client 6 again instructed DUNKI to "address" letters to Client 6 at a Canadian address, but send the letters to Client 6 at a New

York, New York address, "in a plain envelope with [DUNKI's] home address as the address of the sender." Client 6's letter made reference to both a New York office and a New York home maintained by Client 6.

61. Thereafter, MARTIN DUNKI, the defendant, periodically sent Client 6 statements for the undeclared account to an address in New York, New York. Further, Client 6 periodically mailed checks to DUNKI at Swiss Bank No. 1 for deposit in Client 6's undeclared account. For instance, on or about October 14, 2002, Client 6 sent DUNKI a letter enclosing "two checks for deposit in the account with you." These checks, which were valued at $25,000 and $32,333.64, respectively, bore a New York, New York address for Client 6.

62. By the end of 2007, Client 6's undeclared account at Swiss Bank No. 1 contained assets valued at over $100 million. At or around the same time, MARTIN DUNKI, the defendant, recommended that Client 6 consult with Paltzer, a lawyer who was admitted to the bar in both New York and Switzerland, regarding tax and estate planning issues. DUNKI arranged for a meeting between Paltzer and Client 6 in New York, New York.

63. Prior to 2008, Client 6 had held a second undeclared bank account at another bank in Switzerland ("Swiss Bank No. 2"). In or about 2008, however, following the public

investigation of UBS by United States law enforcement, Client 6's client advisor at Swiss Bank No. 2 told Client 6, in substance and in part, that the United States government was becoming increasingly active in investigating U.S. clients abroad, and that Client 6 should move Client 6's undeclared assets out of Swiss Bank No. 2.

64.   Client 6 then informed MARTIN DUNKI, the defendant, that Client 6 was considering moving assets from Swiss Bank No. 2 over to Swiss Bank No. 1.  Client 6 also expressed to DUNKI Client 6's growing concerns that Client 6 would not be able to keep his undeclared assets a secret.  DUNKI again suggested that Client 6 speak to Paltzer.  In or around the same time, DUNKI introduced Client 6 to a partner at Swiss Bank No. 1, and Client 6 informed the partner that Client 6 was a citizen of the United States.

65.   In or about late 2008, Paltzer and Client 6 had a meeting in Switzerland.  Following this meeting, Paltzer established for Client 6 two sham Panamanian foundations, which in turn were the sole shareholders of two sham Liberian corporations, called Araukarie Inc. ("Araukarie") and Blepharitis SA ("Blepharitis").  Paltzer created the sham Panamanian foundations and the sham Liberian corporations for the purpose of holding two undeclared accounts for Client 6 at Swiss Bank No. 1.  In connection with creating these structures

for Client 6, Paltzer wrote to Client 6 at Client 6's address in Fisher Island, Florida, where Client 6 was then residing.

66.   In or about December 2008, Client 6 arranged for Client 6's undeclared assets at Swiss Bank No. 2, which were valued at over $100 million, to be transferred to Swiss Bank No. 1.   All of Client 6's undeclared assets were then consolidated into Client 6's two accounts at Swiss Bank No. 1, which were held in the name of the sham corporations Araukarie and Blepharitis, respectively.   Thereafter, MARTIN DUNKI, the defendant, continued to serve as the client advisor for Client 6's undeclared accounts at Swiss Bank No. 1, up until DUNKI's retirement from Swiss Bank No. 1 in or about early 2012.   By the end of 2011, the value of the assets in Client 6's undeclared accounts totaled nearly $300 million.

67.   On Client 6's Forms 1040 for the tax years 2000 through and including 2012, Client 6 falsely and fraudulently failed to report Client 6's interest in, or signature or other authority over, Client 6's undeclared accounts at Swiss Bank No. 1 and Swiss Bank No. 2.   Moreover, for these years, Client 6 failed to file FBARs disclosing Client 6's undeclared accounts at Swiss Bank No. 1 and Swiss Bank No. 2.

68.   In or about June 2013, Client 6 applied for admission to the voluntary disclosure program, and disclosed Client 6's undeclared accounts to the IRS for the first time.

## Client 7

69.   In or about 1995, a U.S. taxpayer ("Client 7") opened an undeclared account at Swiss Bank No. 1, which was held under Client 7's own name.  Client 7 is a dual citizen of Switzerland and the United States who, at all times relevant to this Indictment, resided in Santa Barbara, California.

70.   MARTIN DUNKI, the defendant, assisted Client 7 in opening Client 7's undeclared account at Swiss Bank No. 1.  At that time, Client 7 informed DUNKI that Client 7 resided in the United States.  Nevertheless, DUNKI and Client 7 agreed to state on the account paperwork that Client 7 resided in Switzerland. DUNKI and Client 7 did this to conceal the existence of Client 7's undeclared account from U.S. authorities. After helping Client 7 open the undeclared account at Swiss Bank No. 1, DUNKI served as Client 7's client advisor with respect to the account.

71.   Client 7 periodically met with MARTIN DUNKI, the defendant, in Switzerland and in Santa Barbara, California, to discuss Client 7's undeclared account and to review account statements.  Client 7 had a mail hold agreement with Swiss Bank No. 1, under which Swiss Bank No. 1 was instructed not to send account statements to Client 7 in the United States.  When DUNKI and Client 7 met in the United States, the account statements that DUNKI showed Client 7 were cut off at the top, to omit from the statements the account number and the name of Swiss Bank No.

1.   DUNKI informed Client 7, in substance and in part, that
DUNKI had to be careful not to leave a trace when going through
U.S. customs.  When DUNKI showed Client 7 account statements in
Switzerland, on the other hand, the statements were complete and
contained the account number and the name of Swiss Bank No. 1.
In or about 2005, DUNKI indicated to Client 7 that it was no
longer safe for DUNKI to travel to the United States.

72.   Client 7 withdrew money from Client 7's
undeclared account at Swiss Bank No. 1 by going in person to
Swiss Bank No. 1 and making cash withdrawals, in amounts of
approximately $5,000 to $6,000 at a time.  Client 7 also
transferred money from his undeclared account at Swiss Bank No.
1 to another account in Israel.  Client 7 arranged for these
transfers to be made either by requesting them in person at
Swiss Bank No. 1, or by calling MARTIN DUNKI, the defendant, and
requesting that DUNKI make the transfers.

73.   In or about 1996, Client 7 opened a second
undeclared account at Swiss Bank No. 1, which was held in the
name of a sham British Virgin Islands corporation called
Moradem.  Client 7 opened this account at the suggestion of
MARTIN DUNKI, the defendant, who explained that Client 7 would
need to open an account in the name of a company in order to
trade in U.S. securities.  The Moradem account was ultimately
not very active, because Client 7's trading was not profitable,

and it held only approximately $30,000 in assets. The undeclared account held in Client 7's own name, however, reached a high value of approximately $70 million.

74. In or about 2008, following the public investigation of UBS by United States law enforcement, MARTIN DUNKI, the defendant, asked Client 7 if there were any other addresses that Client 7 could list on the undeclared account that was held in Client 7's own name. DUNKI told Client 7, in substance, that it was obvious Client 7 did not actually reside in Switzerland, and so the account paperwork should be revised to reflect another non-U.S. address. Client 7, in response, provided to DUNKI an address in Israel. As DUNKI was well aware, Client 7 did not actually reside in Israel. Nevertheless, in or about late 2008, new account opening paperwork was created at Swiss Bank No. 1 to reflect, falsely, that Client 7 was a resident of Israel.

75. On Client 7's Forms 1040 for the tax years 1995 through and including 2008, Client 7 falsely and fraudulently failed to report Client 7's interest in, or signature or other authority over, Client 7's undeclared accounts at Swiss Bank No. 1. Moreover, for these years, Client 7 failed to file FBARs disclosing Client 7's undeclared accounts at Swiss Bank No. 1.

76. In or about October 2009, Client 7 applied for admission to the voluntary disclosure program, and disclosed Client 7's undeclared accounts to the IRS for the first time.

### Client 8

77. In or about 1983, a U.S. taxpayer ("Client 8") opened an undeclared account at Swiss Bank No. 1. Client 8's undeclared account was for the benefit of Client 8, but was held in the name of a sham company created for the purpose of concealing the existence of Client 8's undeclared account from U.S. authorities. Client 8 is a dual citizen of Italy and the United States who, at all times relevant to this Indictment, resided in Chicago, Illinois.

78. A client advisor at Swiss Bank No. 1 (the "Swiss Bank No. 1 Client Advisor") assisted Client 8 in opening Client 8's undeclared account at Swiss Bank No. 1. Although Client 8 is a dual citizen of Italy and the United States, Client 8 did not obtain an Italian passport until in or about 2012, and Client 8 used Client 8's U.S. passport to open the undeclared account at Swiss Bank No. 1. After opening the undeclared account, Client 8 made an initial deposit into the undeclared account of approximately $8.5 million.

79. In or about 1995, MARTIN DUNKI, the defendant, replaced the Swiss Bank No. 1 Client Advisor as the client advisor handling Client 8's undeclared account at Swiss Bank No.

1.  At or around the same time, to help ensure that the account's existence would be concealed from U.S. authorities, DUNKI advised Client 8 that a better structure to use for holding the undeclared account would be a sham company that was wholly owned by a sham foundation.  Thereafter, Client 8's undeclared account at Swiss Bank No. 1 was held by a sham Panamanian corporation called Vatusso, which in turn was wholly owned by a sham foundation called the MHBG Mayfield Foundation.

80.  Client 8 met with MARTIN DUNKI, the defendant, in Chicago, Illinois on approximately four to five occasions to discuss and review the balance of Client 8's undeclared account. These meetings took place either in restaurants or in hotel lobbies.  During at least one of these meetings, DUNKI provided Client 8 with an envelope containing approximately $10,000 in cash, which represented a cash withdrawal from Client 8's undeclared account.  On other occasions, Client 8 made cash withdrawals from Client 8's undeclared account by going in person to Swiss Bank No. 1.  Client 8 never withdrew more than $10,000 in cash at one time, as Client 8 knew that bringing more than $10,000 in cash back to the United States at one time would alert the suspicion of U.S. authorities.

81.  Client 8 did not make any additional deposits into Client 8's undeclared account at Swiss Bank No. 1, following his initial deposit of approximately $8.5 million.

Over time, however, the balance in Client 8's undeclared account grew, reaching a high value of approximately $12 million in or about 2005.

82.   In or about the middle of 2010, Client 8 was asked to leave Swiss Bank No. 1, because Client 8's account was undeclared and because MARTIN DUNKI, the defendant, would soon be retiring.   Swiss Bank No. 1 assisted Client 8 in moving Client 8's undeclared assets to another Swiss bank ("Swiss Bank No. 3"), where Client 8 opened another undeclared account. Client 8's undeclared account at Swiss Bank No. 3, like Client 8's undeclared account at Swiss Bank No. 1, was held in the name of a sham company, which was wholly owned by a sham foundation.

83.   On Client 8's Forms 1040 for the tax years 1983 through and including 2011, Client 8 falsely and fraudulently failed to report Client 8's interest in, or signature or other authority over, Client 8's undeclared accounts at Swiss Bank No. 1 or Swiss Bank No. 3.   Moreover, for these years, Client 8 failed to file FBARs disclosing Client 8's undeclared accounts at Swiss Bank No. 1 or Swiss Bank No. 3.

84.   In or about July 2012, Client 8 applied for admission to the voluntary disclosure program, and disclosed Client 8's undeclared accounts to the IRS for the first time.

## Client 9

85.   In or about 2005, a U.S. taxpayer ("Client 9"), who was a citizen of the United States and was then residing in California, inherited an undeclared account from Client 9's father.  At the time, the account was held at UBS in the name of a sham Liechtenstein foundation and denominated by combining the first name of Client 1 with the first names of Client 9's siblings.

86.   After the death of Client 9's father, Client 9 was contacted by Client 9's father's former client advisor at UBS, who had by then left UBS to become an independent asset manager.  The purpose of the call was to instruct Client 9 to travel to Switzerland to split Client 9's father's account among Client 9and Client 9's siblings.  At the time, the balance in the account of Client 9's father at UBS was approximately $3.1 million.

87.   In or about late 2006, Client 9 decided to transfer the assets held at UBS to another bank.  Paltzer recommended that Client 9 open a new account at Swiss Bank No. 1.  Paltzer informed Client 9 that Paltzer had a friend who worked at Swiss Bank No. 1 and that Swiss Bank No. 1 was as secretive as other Swiss banks.

88.   In or about late 2006, Client 9 traveled to Switzerland to execute the account-opening documents for Client

36

9's account at the offices of Swiss Bank No. 1.  Both MARTIN
DUNKI, the defendant, and Paltzer attended the account-opening
meeting with Client 9.  During that meeting, Client 9 made it
clear that Client 9 was a U.S. resident, and DUNKI assured
Client 9 that Client 9's account would not be reported to
authorities in the United States.  DUNKI further assured Client
9 that Swiss Bank No. 1 had the ability to keep Client 9's
account a secret, and that Client 9's undeclared account at
Swiss Bank No. 1 would operate in the same manner as it had
operated at UBS.

89.  In order to facilitate the transfer of assets
from UBS to Swiss Bank No. 1, and to minimize the risk of
discovery by U.S. authorities of Client 9's undeclared account,
a sham British Virgin Islands corporation called Trembath Invest
& Finance Inc. ("Trembath") was used to open the account for
Client 9 at Swiss Bank No. 1.  MARTIN DUNKI, the defendant, told
Client 9 that Trembath would be used to hold Client 9's
undeclared account as a method of keeping Client 9's account a
secret.  The amount of funds transferred from UBS to Client 9's
newly opened account at Swiss Bank No. 1 was approximately
$1.071 million.

90.  Paltzer also instructed Client 9 that, when
Client 9 wished to withdraw funds from Client 9's account at
Swiss Bank No. 1, Client 9 should contact Paltzer, who would, in

turn, send Client 9 a check by mail.  Paltzer further informed
Client 9 that Paltzer would never send Client 9 any checks for
an amount greater than $10,000 because doing so would trigger
reporting requirements for banks in the United States.

91.  Between in or about 2007 and in or about 2009,
Client 9 requested numerous checks from Paltzer, each of which
represented a withdrawal from Client 9's undeclared account at
Swiss Bank No. 1.  When Paltzer received these requests for
checks from Client 9, he passed the requests on to MARTIN DUNKI,
the defendant, who prepared the checks for Paltzer to send to
Client 9 in the United States.  The checks were typically drawn
on the U.S. based correspondent bank account maintained by
another Swiss bank ("Swiss Bank No. 4"), at a financial
institution in the United States.  Some of the checks prepared
by DUNKI and sent by Paltzer were made payable, at Paltzer's
suggestion, to Client 9's husband and Client 9's stepfather to
further minimize the risk of detection by U.S. authorities.
Paltzer also advised Client 9 to stagger, or structure, the
deposit of the checks that Paltzer sent and never to deposit a
total of more than $10,000 in any one day in order to reduce
suspicion.

92.  Between in or about 2007 and in or about 2009,
MARTIN DUNKI, the defendant, prepared the following checks,
among others, which Paltzer sent to Client 9 in the United

States, and which were drawn on the correspondent bank account of Swiss Bank No. 4 in a manner designed to minimize the risk of the detection by U.S. authorities of Client 9's undeclared account:

| Check No. | Approximate Amount | Payee | Approximate Date Issued |
|-----------|--------------------|-------|-------------------------|
| 372955 | $6,374.26 | Client 9 | 3/15/2007 |
| 372956 | $7,487.39 | Client 9's husband | 3/15/2007 |
| 373583 | $8,347.00 | Client 9's stepfather | 5/11/2007 |
| 373584 | $8,414.00 | Client 9's husband | 5/11/2007 |
| 373585 | $8,723.00 | Client 9 | 5/11/2007 |
| 378981 | $8,815.00 | Client 9's husband | 11/5/2008 |
| 378982 | $9,521.50 | Client 9 | 11/5/2008 |
| 379840 | $9,245.30 | Client 9's stepfather | 2/10/2009 |
| 379841 | $8,972.50 | Client 9 | 2/10/2009 |
| Total: | $75,899.95 | | |

93. On Client 9's Forms 1040 for the tax years 2005 through and including 2008, Client 9 falsely and fraudulently failed to report Client 9's interest in, or signature or other authority over, Client 9's undeclared accounts at Swiss Bank No. 1 or UBS. Moreover, for these years, Client 9 failed to file FBARs disclosing Client 9's undeclared accounts at Swiss Bank No. 1 or UBS.

94.   In or about September 2009, Client 9 applied for admission to the voluntary disclosure program, and disclosed Client 9's undeclared accounts to the IRS for the first time.

### Statutory Allegations

95.   From at least in or about 1995 through at least in or about 2012, in the Southern District of New York and elsewhere, MARTIN DUNKI, the defendant, together with others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to defraud the United States of America and an agency thereof, to wit, the IRS, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Sections 7201 and 7206(1).

96.   It was a part and an object of the conspiracy that MARTIN DUNKI, the defendant, together with others known and unknown, willfully and knowingly would and did defraud the United States of America and the IRS for the purpose of impeding, impairing, obstructing, and defeating the lawful governmental functions of the IRS in the ascertainment, computation, assessment, and collection of revenue, to wit, federal income taxes.

97.   It was further a part and an object of the conspiracy that MARTIN DUNKI, the defendant, together with others known and unknown, willfully and knowingly would and did

attempt to evade and defeat a substantial part of the income tax due and owing to the United States of America from clients of DUNKI's who were U.S. taxpayers, in violation of Title 26, United States Code, Section 7201.

98.   It was further a part and an object of the conspiracy that MARTIN DUNKI, the defendant, together with others known and unknown, willfully and knowingly would and did make and subscribe returns, statements, and other documents, which contained and were verified by written declarations that they were made under the penalties of perjury, and which DUNKI, together with others known and unknown, did not believe to be true and correct as to every material matter, in violation of Title 26, United States Code, Section 7206(1).

**Overt Acts**

99.   In furtherance of the conspiracy and to effect the illegal objects thereof, MARTIN DUNKI, the defendant, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   On or about February 13, 2001, DUNKI, on behalf of Swiss Bank No. 1, sent a letter to Client 6 at an address in New York, New York.

b.    In or about the early 2000s, DUNKI met with Client 8 in Chicago, Illinois and provided Client 8 with approximately $10,000 in cash.

c.    On or about August 24, 2007, DUNKI and Paltzer, at the request of Client 5, arranged to transfer approximately $100,000 from an undeclared account held by Client 5 at Swiss Bank No. 1 to a diamond dealer in New York, New York.

d.    On or about December 18, 2008, DUNKI arranged to transfer Client 1 and Client 2's undeclared assets from an account held at Swiss Bank No. 1 by a sham Liechtenstein foundation to a new account held at Swiss Bank No. 1 by a sham Panamanian foundation.

e.    On or about February 10, 2009, DUNKI prepared two checks in the amounts of $9,245.30 and $8,972.50, respectively, which Paltzer sent to Client 9 in the United States.

f.    On or about May 6, 2010, DUNKI had gold coins delivered to Paltzer to store at a vault at UBS for the benefit of Client 3.

(Title 18, United States Code, Section 371.)

_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

42

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

MARTIN DUNKI,

Defendant.

## INDICTMENT

14 Cr. ___ (__)

(18 U.S.C. § 371)

PREET BHARARA
United States Attorney.

A TRUE BILL

Foreperson.

*11/13/14*
*ae* - *Filed Indictment*
*Case assigned to Judge Forrest*
*Judge presiden*
*USMJ*